**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NATHANIEL KENYON,** | : | **Civil No.  1:22-CV-1457** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **KILOLO KIJAKAZI** | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM OPINION**

## I.    Introduction

We do not write upon a blank slate in this case. Quite the contrary, this is the plaintiff's second Social Security appeal, Kenyon's case having previously been remanded to the Commissioner by this court. See <u>Kenyon v. Saul</u>, No. 1:20-CV-1372, 2021 WL 2015067, at *1 (M.D. Pa. May 19, 2021). Nathaniel Kenyon's latest Social Security appeal arises in an unusual legal and factual context. Both at the initial administrative hearing, and now on remand following a second hearing, the ALJ has rejected every medical opinion of record, finding all of the expert opinions unpersuasive. The ALJ then has twice fashioned  an RFC that was unmoored to any medical opinion.

1

This course of action by the ALJ calls upon us to consider two longstanding principles regarding the duties of an Administrative Law Judge (ALJ): First, we must assess whether the ALJ fulfilled her duty to fully articulate the basis of a residual functional capacity (RFC) assessment, particularly when that RFC rejects all of the medical opinions on the record before the ALJ. In addition, we must examine the duty of the ALJ to fully develop a factual record in order to ensure that there is a legal and logical bridge between the evidence and the ultimate disability determination.

Mindful of the fact that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant," and recognizing that "even though an ALJ is not bound to accept the statements of any medical expert, he may not substitute his own judgment for that of a physician," Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), we conclude that the ALJ's decision to reject all medical opinions in this case is still not supported by a sufficient articulated rationale. Moreover, in this case where the ALJ chose to reject every medical opinion, including a treating source consensus that Kenyon is completely disabled due to his severe anxiety, we conclude that the ALJ has a duty to more fully develop a factual record in order to ensure that there is a legal and logical bridge between the

2

evidence and the ultimate disability determination. Therefore, we will remand this case once again for further consideration and evaluation of the medical opinion evidence.

## II.    Statement of Facts and of the Case

On July 28, 2017, Nathaniel Kenyon applied for disability insurance benefits alleging that he was totally disabled due to anxiety, depression, post-traumatic stress disorder, and bipolar disorder. (Tr. 15, 17). Kenyon, who alleged an amended onset of disability on August 1, 2017, (Tr. 207), was born in July of 1991 and was 25 years old at the time of the alleged onset of his disability. (Tr. 25).

In connection with this disability application, On August 22, 2017, Kenyon and his spouse, Hayley Kenyon, submitted adult function and third-party reports which carefully detailed the nature of Kenyon's emotional disability. (Tr. 218-225, 226-231). These reports acknowledged that Kenyon had the ability to perform tasks of daily living, but explained that the plaintiff suffered from profound, and often paralyzing anxiety and depression that rendered him unable to engage in sustained employment or meet the emotional demands of the workplace on an ongoing basis. (Id.)  Thus, these reports clearly focused upon Kenyon's episodes of anxiety and depression as the root causes of his claimed disability. With Kenyon's claim defined

in this fashion, the clinical record provided ample support for his assertion that he was significantly impaired due to these mental health conditions.

A.   **Kenyon's Clinical History of Anxiety and Depression**

The emotional impairments claimed by the plaintiff were well documented in Kenyon's clinical treatment records. Taken as a whole, there was a dichotomy to these treatment notes and records. While Kenyon's lengthy treatment history acknowledged that he was fully oriented and often displayed a normal affect, those records also routinely documented Kenyon's anxiety and depression.[1] With respect to his depression and anxiety, the immediate disabling concerns cited by the plaintiff, Kenyon's treatment history was also marked by frequent episodes of crying, depression, and on-going reports of heightened anxiety. (Tr. 501, 507, 520-21, 635).

As early as April of 2016, Kenyon was being treated for depression and anxiety, conditions which manifested themselves during an emergency room visit for breathing difficulties. (Tr. 301-04). Kenyon's treatment records throughout 2016 consistently documented his depression and anxiety. (Tr. 407-440, 463-464). While the severity of his symptoms fluctuated during this time, Dr. Renzi, Kenyon's

---

[1] See e.g., Tr. 383-84, 386-87, 389-90, 501-02, 507-08, 510-11, 513-14, 544-45, 584-85, 587-88, 590-91.

primary care physician, documented an array of severe anxiety-based emotional impairments experienced by Kenyon during this time.

For example, on April 15, 2016, it was reported that Kenyon was suffering from anxiety attacks almost every day. (Tr. 463). On May 26, 2016, treatment notes reflected that Kenyon suffered from "breakthrough" anxiety attacks and crying episodes. (Tr. 439). Dr. Renzi continued to document near daily anxiety attacks by Kenyon on June 30, 2016, and frequent panic attacks on August 3, 2016. (Tr. 422, 428).

Kenyon's treatment notes indicate that the same pattern of consistent reports of anxiety and depression marked by fluctuating severity continued in 2017. (Tr. 383-406, 610-626). In a number of instances during 2017, Kenyon's caregivers reported that he was facing severe debilitating anxiety. For example, notes from January and February of 2017 documented Kenyon's anxiety and depression. (Tr. 403, 405). While treatment records indicated some period of remission, on July 5, 2017, these records stated that Kenyon was crying more frequently. (Tr. 389). Two weeks later on July 17, 2017, treatment reported that Kenyon's "anxiety and depression have be[e]n getting a lot worse", indicated that he suffered "frequent" panic attacks, was "crying often" and had experienced some suicidal thoughts. (Tr. 386). By September 1, 2017, Kenyon related that "his anxiety and depression are

5

continuing to get worse [he] is not sleeping at night and feels depressed like he is going to cry most of the day." (Tr. 626). By the end of 2017, on December 10, Kenyon's caregivers noted that "he is really struggling again. Feeling more depressed and having panic attacks almost daily again." (Tr. 610). On December 20, 2017, Kenyon's caregivers were reporting that he presented with obsessive worries, daily anxiety, and depression which manifested itself through very low energy on Kenyon's part. (Tr. 660-61).

This pattern of anxiety and depression marked by periods of relative remission and episodes of acute impairment continued in 2018. (Tr. 501-593). On February 9, 2018, his caregivers recorded that Kenyon's "anxiety level [is] still quite high." (Tr. 593). Two weeks later, on February 22, 2018, it was noted that Kenyon's anxiety "is really high," (Tr. 590), and one week after that, on February 28, 2018, Kenyon was described as "feeling very down [and] depressed." (Tr. 587).  March 15, 2018, treatment notes observed that Kenyon was "down and depressed all the time." (Tr. 584).

By May 14, 2018, Dr. Renzi recorded that Kenyon's "[a]nxiety is all over the place [and] [he is] having frequent panic attacks." (Tr. 554). On July 2, 2018, caregivers observed that Kenyon "is struggling with his anxiety and depression, is crying more frequently." (Tr. 544). During a July 28, 2018, emergency room

encounter Kenyon was reportedly "tearful," (Tr. 520), and on July 31, 2018, Dr. Renzi reported that Kenyon was experiencing "continued issues with anxiety." (Tr. 513).

Treatment notes documented a continued decline in Kenyon's emotional state throughout the autumn of 2018. By September 4, 2018, it was reported that Kenyon's "depression seems to be worse lately." (Tr. 510). On September 23, 2018, Dr. Renzi noted that Kenyon was in acute distress, stating that he:

> Tried to [go] back to work last Wednesday. Made it through the end of the week, but unable to go today. Feel[s] extremely overwhelmed and anxious. Little noises would set him off at work and he would have flashbacks.

(Tr. 507).

In October of 2018, Kenyon's caregivers were still documenting that he was experiencing depression, frequent crying, and flashbacks. (Tr. 501). One month later, in November of 2018, Kenyon's treatment providers described him as very anxious, and noted that as a result of his emotional impairments he was delayed in his responses to their inquiries. (Tr. 680).

These symptoms were further documented by Kenyon's treating sources throughout the more recent course of these disability proceedings. For example, in January of 2019, Kenyon "noticed increased panic attacks and chest pain," (Tr. 688), as well as "significantly increased anxiety". (Tr. 691). By September 3, 2019, it was

observed that his "[a]nxiety has been getting progressively worse over the last couple of months," (Tr. 1027), an observation that was repeated in a November 1, 2019, treatment encounter. (Tr. 1018). As of December 3, 2019, Dr. Renzi reported that Kenyon was "VERY TEARFUL IN OFFICE. ANXIETY IS THRUOUGH [sic] ROOF." (Tr. 1015) (All caps in original).

On March 11, 2000, caregivers recorded that Kenyon was "[h]aving episodes where he feels like he is going to pass out" due to his anxiety. (Tr. 1000). By the summer of 2021 it was reported that Kenyon's anxiety had worsened significantly and was interfering with his ability to work at a new job. (Tr. 967, 971).

Kenyon's thoroughly documented history of anxiety and depression was also noteworthy in one other respect. Treatment notes frequently acknowledged that Kenyon's anxiety interfered with his ability to meet the mental demands of the workplace. For example, on July 19, 2017, Dr. Renzi reported that Kenyon's:

> Anxiety and depression have ben[sic] getting a lot worse. Feels worried all the time and is having frequent panic attacks and crying often. Tried to start a new job last week and left after 4 hours because he felt so stressed out and anxious.

(Tr. 386).

On September 23, 2018, Dr. Renzi noted that Kenyon's anxiety was overwhelming in a work setting, stating that he:

> Tried to [go] back to work last Wednesday. Made it through the end of the week, but unable to go today. Feel[s] extremely overwhelmed and anxious. Little noises would set him off at work and he would have flashbacks.

(Tr. 507).

As of August 19, 2021, Dr. Renzi described further anxiety related barriers to employment for Kenyon, explaining that:

> Anxiety and depression continue to impact him. Now interfering with his job as he is getting [upset] easily and very overwhelmed. Has been calling off because he just feels like he can't deal with everything.

(Tr. 967).

It was against this clinical backdrop, which documented the severity of Kenyon's anxiety and depression, as well as its impact upon his ability to meet the mental demands of the workplace, that Kenyon's treating sources opined regarding the disabling effects of his emotional impairments.

## B.   **Medical Opinion Evidence**

Based upon their clinical experience with the plaintiff, three treating sources provided numerous medical statements assessing Kenyon's ability to perform work on a sustained basis given the emotional impairments that he experienced. All three of these treating sources found that Kenyon's emotional impairments were disabling.

For example, as early as April 28, 2016, Anika Webb, a physician assistant who worked with Dr. Renzi, Kenyon's primary care physician, opined that Kenyon's

9

anxiety disorder would make it very difficult and medically necessary for the plaintiff to miss work during emotional flare-ups. (Tr. 455-56). Physician Assistant Webb also documented a significant decline in Kenyon's mental state between 2017 and 2018. Thus, in December of 2017, P.A. Webb found that Kenyon experienced extreme anxiety, which moderately impaired his ability to make complex work-related decisions, but otherwise concluded that his mental health impairments were mild. (Tr. 605-07). Additionally, by October 2018, P.A. Webb was reporting that Kenyon's condition and emotional stability had declined significantly. According to P.A. Webb, by October 2018, Kenyon was extremely limited in his ability to handle stress, interact with the public and supervisors, and maintain concentration, persistence, and pace. P.A. Webb also opined in the Fall of 2018 that Kenyon would be off-task 1/3 of the time at work and would miss 3 days or more of work each month due to this anxiety disorder. (Tr. 499-500). Most recently, these findings were echoed by P.A. Webb in an April 2022 medical questionnaire, in which she opined that Kenyon was moderately to markedly impaired in a number of realms of functioning and would experience absenteeism more than 3 times each month due to his anxiety. (Tr. 939-941).

Notably, these medical opinions were often rendered at times when clinical notes contemporaneously confirmed severe symptoms on Kenyon's part. For

example, Physician Assistant Webb's October 2018 medical opinion was issued at a time when September 23, 2018, treatment notes described Kenyon's acute distress, stating that he:

> Tried to [go] back to work last Wednesday. Made it through the end of the week, but unable to go today. Feel[s] extremely overwhelmed and anxious. Little noises would set him off at work and he would have flashbacks.

(Tr. 507).

Physician Assistant Webb was not alone in opining that Kenyon's emotional impairments were disabling. Dr. Renzi, who had an extended longitudinal treatment history with Kenyon, also stated in February of 2019 that the plaintiff was extremely impaired in all spheres of workplace functioning due to his persistent anxiety disorder, would be off-task 1/3 of the time at work, and would miss 3 days or more of work each month due to this anxiety disorder. (Tr. 664-65). These findings were tantamount to a determination that Kenyon was disabled.

These clinical findings were echoed by a third treating source, Teresa Allen, the plaintiff's counselor, who also completed a mental health questionnaire in October of 2018. (Tr. 646-47). This treating source opinion also found that Kenyon was extremely limited in his ability to handle stress, interact with the public and supervisors, and perform tasks at a consistent pace while maintaining attendance at work. In fact, Ms. Allen concluded that Kenyon would be off-task 1/3 of the time at

11

work and would miss 3 days or more of work each month due to this anxiety disorder. (Id.)

Once again, Counselor Allen's medical opinion concerning the severity of Kenyon's symptoms was directly correlated to contemporaneous treatment notes which document a continued decline in Kenyon's emotional state throughout the autumn of 2018.  By September 4, 2018, it was reported that Kenyon's "depression seems to be worse lately." (Tr. 510). On September 23, 2018, Dr. Renzi noted that Kenyon was in acute distress, stating that he:

> Tried to [go] back to work last Wednesday. Made it through the end of the week, but unable to go today. Feel[s] extremely overwhelmed and anxious. Little noises would set him off at work and he would have flashbacks.

(Tr. 507).

In October of 2018, Kenyon's caregivers were still documenting that he was experiencing depression, frequent crying, and flashbacks. (Tr. 501). One month later, in November of 2018, Kenyon's treatment providers described him as very anxious, and noted that as a result of his emotional impairments he was delayed in his responses to their inquiries. (Tr. 680).

Thus, Kenyon's three treating sources each reported in a highly consistent fashion that Kenyon suffered from emotional impairments which were disabling in the workplace. Moreover, these medical opinions often drew direct support from

clinical records documenting the severity of Kenyon's impairments. Taken together, these three treating source opinions described a man in severe emotional decline who, by late Fall of 2018, was unable to meet the demands of the workplace due to his anxiety disorder. In stark contrast to this treating source consensus was the view of the non-examining state agency expert, Dr. Galdieri, who opined in September of 2017 that Kenyon did not experience any severe emotional impairments whatsoever. (Tr. 91).

### C.   **Administrative Proceedings**

There have now been two ALJ decisions rendered in this case. It was against this clinical backdrop that an ALJ conducted the first hearing regarding Kenyon's disability application on April 2, 2019. (Tr. 32-64). Kenyon and a vocational expert both appeared and testified at this hearing. (Id.) In his testimony, Kenyon described the severity of his emotional symptoms in terms that were entirely consistent with the consensus views of the treatment providers, describing daily anxiety attacks, episodes of depression and crying, and an inability to function due to stress. (Tr. 38-42).

Following this hearing on May 22, 2019, the ALJ issued a decision denying Kenyon's application for benefits. (Doc. 12-26). In that decision, the ALJ fashioned an RFC for Kenyon that was unmoored to any medical opinion and, in fact,

contradicted and rejected all of these medical opinions, finding that Kenyon could perform work at all exertional levels in a simple routine workplace environment. (Tr. 20).

In reaching this conclusion, the ALJ discounted all of the medical expert opinions. Thus, the ALJ concluded that Dr. Renzi's opinions were "not persuasive," rejecting the views of the treating source who had dealt directly with Kenyon for nearly three years. (Tr. 23). The ALJ likewise concluded that Ms. Allen's treating source opinion was not persuasive in view of the record. (Tr. 24). As for the opinions expressed by Physician Assistant Webb, the ALJ gave some weight to her initial assessment of moderate limitations on Kenyon's part but entirely discounted her October 2018 conclusion that Kenyon's emotional impairments were disabling. (Tr. 23). In reaching this result, which rejected this treating source consensus, the ALJ never addressed the striking consistency of these opinions, which all reflected a severe decline in Kenyon's mental state by the Fall of 2018. Finally, and somewhat enigmatically, the ALJ stated that the opinion of the state agency expert, Dr. Galdieri, who opined that Kenyon suffered from no severe mental impairments, was "not . . . entirely persuasive." (Tr. 24). While this phrasing suggested that the opinion had some persuasive value, but was not entirely persuasive, this suggestion was belied by the ALJ's complete rejection of Dr. Galdieri's conclusion that Kenyon

suffered from no severe impairments. Instead, the ALJ concluded that Kenyon experienced multiple severe mental impairments.

Upon consideration, we found that the evaluation of these medical opinions was incomplete and flawed. Accordingly, we remanded this case for further consideration and evaluation of the medical opinion evidence. See Kenyon v. Saul, No. 1:20-CV-1372, 2021 WL 2015067, at *1 (M.D. Pa. May 19, 2021). The ALJ then conducted a second hearing but has reached a similar and similarly flawed conclusion. On May 12, 2022, Kenyon had a second administrative hearing in this case. (Tr. 754-784). At this hearing Kenyon testified regarding how he had lost jobs due to his anxiety attacks and chronic absenteeism. (Id.) Kenyon's testimony was entirely consistent with his treatment notes which indicated on August 19, 2021, that:

> Anxiety and depression continue to impact him. Now interfering with his job as he is getting [upset] easily and very overwhelmed. Has been calling off because he just feels like he can't deal with everything.

(Tr. 967).

Moreover, this testimony was bolstered by the latest treating source opinion, P.A. Webb's April 2022 medical questionnaire response, in which she opined that Kenyon was moderately to markedly impaired in a number of realms of functioning

15

and would experience absenteeism more than 3 times each month due to his anxiety. (Tr. 939-941).

Notwithstanding this additional uncontradicted corroborative evidence confirming the severity of Kenyon's emotional impairments, on May 23, 2022, the ALJ issued a second decision denying Kenyon's claim. (Tr. 733-748). In this opinion the ALJ once again rejected every medical opinion, including the longstanding medical consensus from three separate treating sources that Kenyon's emotional impairments were disabling. (Tr. 743-745). The rationale for the wholesale rejection of all of these medical opinions was sparse and consisted of little more than the following rote recital repeated by the ALJ with respect to each and every treating opinion, stating that the opinions were:

> generally inconsistent with the evidence as a whole, showing no psychiatric hospitalizations, fair to good memory, judgment, and concentration, improved panic symptoms and generally normal behavior, and sporadic mood disturbance with otherwise normal mood and affect.

(Tr. 744, 745).

This rote recital, however, was at odds with Kenyon's treatment history, which cannot be fairly characterized as showing improved panic symptoms, generally normal behavior, and only sporadic mood disturbance. Quite the contrary, the treatment notes are consistent with the treating source opinions and reveal

16

frequent and severe mood symptoms and disabling anxiety which left Kenyon unable to meet the mental demands of the workplace.

Having chosen to reject every medical opinion once again the ALJ then declined to obtain some independent medical consultative examination which might have informed the decision-making in this case. Instead, the ALJ unilaterally fashioned a mental RFC for Kenyon which was unmoored to any medical opinion and was untethered to the treatment records when read as a whole. Based upon this RFC the ALJ concluded that Kenyon was capable of meeting the mental demands of the workplace and denied his claim. (Tr. 748).

This appeal followed. Upon careful consideration of the entire record we conclude that the ALJ still has not provided sufficient justification for rejecting every treating source opinion, which draw substantial support from the clinical record. We further find that the ALJ's description of Kenyon's treatment history as marked by improved panic symptoms and generally normal behavior, and sporadic mood disturbance with otherwise normal mood and affect is not supported by substantial evidence. Finally, we conclude that the ALJ erred in failing to more fully develop the medical record through a consultative examination given the ALJ's decision to discount all of the existing medical opinions. Therefore, we will remand this case for further proceedings by the Commissioner.

## III.  <u>Discussion</u>

### A.  <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  <u>See</u> 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote

a lack of substantial evidence.") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford</u>, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable

20

meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a).   To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a).  To receive benefits under

Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e),  404.1545(a)(1),  416.920(e),  416.945(a)(1).   In  making  this assessment,  the  ALJ  considers  all  of  the  claimant's  medically  determinable

impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller, 962 F.Supp.2d at 778–79 (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize

the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

25

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C. The ALJ's Duty to Adequately Develop the Record

In this administrative setting it is also axiomatic that:

> ALJs have a duty to develop a full and fair record in social security cases. See Brown v. Shalala, 44 F.3d 931, 934 (11th Cir.1995); Smith v. Harris, 644 F.2d 985, 989 (3d Cir.1981). Accordingly, an ALJ must secure relevant information regarding a claimant's entitlement to social security benefits. Hess, 497 F.2d at 841.

Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995).

26

In particular, "[t]he ALJ has a duty to develop the record when there is a suggestion of mental impairment by inquiring into the present status of impairment and its possible effects on the claimant's ability to work." Plummer v. Apfel, 186 F.3d 422, 434 (3d Cir. 1999). One of the tools available to an ALJ in this setting is a consultative examination. Chalfant v. Comm'r of Soc. Sec., No. 4:20-CV-1719, 2022 WL 838118, at *5 (M.D. Pa. Mar. 21, 2022). On this score:

> The decision to order a consultative examination is within the sound discretion of the ALJ unless the claimant establishes that such an examination is necessary to enable the ALJ to make the disability decision." Miller v. Berryhill, No. 17-cv-1452, 2019 WL 3776662, at *18 (M.D. Pa. Aug. 12, 2019) (citing Thompson v. Halter, 45 F. App'x. 146, 149 (3d Cir. 2002)). "[W]here the medical evidence in the record is inconclusive, a consultative examination is often required for proper resolution of a disability claim." Brown v. Saul, No. 18-cv-01619, 2020 WL 6731732, at *10 (M.D. Pa. Oct. 23, 2020) (report and recommendation adopted by 2020 WL 6729164 (M.D. Pa. Nov. 16, 2020)) (citing Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997)).
>
> Id. at *5.

However, when it is given that a claimant has a clear history of depressive symptoms, an "ALJ fail[s] in her duty to develop the record when she d[oes] not order a consultative examination." Id. at *6 .

### D.    **Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

Kenyon filed his disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security

claims. Prior to March 2017, ALJs were required to follow regulations that defined

medical opinions narrowly and created a hierarchy of medical source opinions with

treating sources at the apex of this hierarchy. However, in March of 2017, the

Commissioner's regulations governing medical opinions changed in a number of

fundamental ways. The range of opinions that ALJs were enjoined to consider were

broadened substantially, and the approach to evaluating opinions was changed from

a hierarchical form of review to a more holistic analysis. As one court has aptly

observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior
> Social Security Rulings, including SSR 96-2p, have been rescinded.
> According to the new regulations, the Commissioner "will no longer
> give any specific evidentiary weight to medical opinions; this includes
> giving controlling weight to any medical opinion." Revisions to Rules
> Regarding the Evaluation of Medical Evidence ("Revisions to Rules"),
> 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see
> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner
> must consider all medical opinions and "evaluate their persuasiveness"
> based on the following five factors: supportability; consistency;
> relationship with the claimant; specialization; and "other factors." 20
> C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of
> medical sources, deference to specific medical opinions, and assigning
> "weight" to a medical opinion, the ALJ must still "articulate how [he
> or she] considered the medical opinions" and "how persuasive [he or
> she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and
> (b)(1), 416.920c(a) and (b)(1). The two "most important factors for
> determining the persuasiveness of medical opinions are consistency and
> supportability," which are the "same factors" that formed the

foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." <u>Id.</u> at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." <u>Id.</u> at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. <u>Id.</u> at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). <u>Id.</u> at §§ 404.1520c(b)(3), 416.920c(b)(3).

<u>Andrew G. v. Comm'r of Soc. Sec.</u>, No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well established that "[t]he ALJ – not treating or examining physicians or State agency

consultants – must make the ultimate disability and RFC determinations." <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000) (quoting <u>Mason</u>, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. <u>See</u> <u>Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); <u>Turner v. Colvin</u>, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); <u>Connors v. Astrue</u>, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. <u>See e.g., Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

It is against these legal benchmarks that we assess the instant appeal.

### D.    <u>This Case Should Be Remanded for Further Consideration and Development of the Medical Opinion Evidence.</u>

This case presents a striking circumstance. In fashioning an RFC for the plaintiff and denying this disability claim, the ALJ on two occasions rejected every

medical opinion. Instead, relying upon her subjective evaluation of Kenyon's treatment records, the ALJ has crafted an RFC that is unhinged to any medical opinion and contradicts all of the medical opinions in the administrative record. The ALJ has also rejected a treating source consensus from three different medical sources who had cared for Kenyon over a span of years. That treating source consensus found Kenyon's emotional impairments to be disabling. Moreover, that treating source consensus often drew upon contemporaneous treatment notes which thoroughly documented the severity of Kenyon's anxiety and the ways in which it undermined his ability to meet the emotional demands of the workplace.

In our view, the ALJ's justification for this course of action—which consisted of the rejection of every treating source medical opinion—cannot be justified based upon the rote recital that these opinions were:

> generally inconsistent with the evidence as a whole, showing no psychiatric hospitalizations, fair to good memory, judgment, and concentration, improved panic symptoms and generally normal behavior, and sporadic mood disturbance with otherwise normal mood and affect.

(Tr. 744, 745).

Indeed, the ALJ's evaluation of this evidence is flawed in several fundamental ways. First, substantial evidence does not support the ALJ's characterization of Kenyon's condition as showing improved panic symptoms and generally normal

31

behavior, and only sporadic mood disturbance with otherwise normal mood and affect. Quite the contrary, these treatment notes, which span years, are replete with references to severe, recurring episodes of disabling anxiety. Moreover, these treatment notes explicitly, and consistently described how Kenyon's impairments interfered with his ability to work. For example, on July 19, 2017, Dr. Renzi reported that Kenyon's:

> Anxiety and depression have ben[sic] getting a lot worse. Feels worried all the time and is having frequent panic attacks and crying often. Tried to start a new job last week and left after 4 hours because he felt so stressed out and anxious.

(Tr. 386).

On September 23, 2018, Dr. Renzi noted that Kenyon's anxiety was overwhelming in a work setting, stating that he:

> Tried to [go] back to work last Wednesday. Made it through the end of the week, but unable to go today. Feel[s] extremely overwhelmed and anxious. Little noises would set him off at work and he would have flashbacks.

(Tr. 507).

As of August 19, 2021, Dr. Renzi described further anxiety related barriers to employment for Kenyon, explaining that:

> Anxiety and depression continue to impact him. Now interfering with his job as he is getting [upset] easily and very overwhelmed. Has been calling off because he just feels like he can't deal with everything.

(Tr. 967).

Given this evidence, the ALJ's description of Kenyon's clinical history does not draw support from substantial evidence in the record. Therefore, a remand is warranted here to further consider and address this clinical record.

Moreover, in the absence of some further explanation and articulation of its rationale, the ALJ's decision cannot be reconciled with the revised medical opinion regulations that the ALJ was obliged to follow. Those regulations eschew any hierarchical ranking of opinions, but call upon ALJ's to evaluate medical opinions against the following benchmarks:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.
>
> (3) Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i) through (v) of this section.
>
> > (i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

33

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

20 C.F.R. § 404.1520c.

In this case, a dispassionate assessment of the treating source consensus that Kenyon was totally disabled against these regulatory criteria continues to cast grave doubt upon the sufficiency of the ALJ's medical opinion analysis. Indeed, in our view, all of the factors relating to Kenyon's relationship with these medical sources favored recognizing the persuasive power of these opinions. Thus, Kenyon had a longstanding, first-hand treatment relationship with these caregivers that involved repeated contacts over several years. Therefore, the treating sources had a uniquely

34

valuable longitudinal perspective on Kenyon's mental state, a fact which the ALJ failed to sufficiently assess in her analysis.

Further, given that "supportability . . . and consistency . . . are the most important factors [to] consider when [] determine[ing] how persuasive [to] find a medical source's medical opinions . . . to be," 20 C.F.R. § 404.1520c(b)(2), we find that the ALJ's evaluation of these treating source opinions failed to adequately address several critical factors. First, taken together, the opinions of Dr. Renzi, P.A. Webb, and Counselor Allen are remarkably consistent in their evaluation of Kenyon's mental state and ability to work in the Fall of 2018 and early 2019. From three different treatment perspectives, each of these sources reached consistent conclusions regarding the degree of Kenyon's impairment, the extent to which he would be off-task, and the degree to which his impairments would result in chronic absenteeism from work. Given that consistency of opinions is one of the most important factors to assess in this medical opinion analysis, the ALJ's failure to adequately address these remarkably consistent opinions requires a remand when all of the consistent treating opinions are rejected in favor of the ALJ's own *ad hoc* and medically unsupported RFC determination.

Further, the ALJ's medical opinion evaluation ignores the fact that these medical opinions were supported in many instances by contemporary treatment

35

records, which documented the precise degree of sever impairment described by the treating sources in their opinions.  Instead, as we have noted, the ALJ seems to have relied upon a repeated, and inaccurate, rote recital of Kenyon's treatment history to discount all of these opinions.

Simply put, these treating source opinions have significant indicia of consistency and supportability, factors that are the hallmarks of a persuasive opinion under the Commissioner's current regulations. Therefore, the ALJ erred in finding all of these opinions unpersuasive based upon an incomplete description of Kenyon's treatment history.

Finally, we conclude that the ALJ erred in failing to further develop the administrative record through a consultative examination once she determined that every medical opinion in this case was unpersuasive. As we have noted, "[t]he ALJ has a duty to develop the record when there is a suggestion of mental impairment by inquiring into the present status of impairment and its possible effects on the claimant's ability to work." Plummer v. Apfel, 186 F.3d 422, 434 (3d Cir. 1999). One of the tools available to an ALJ in this setting is a consultative examination. Chalfant v. Comm'r of Soc. Sec., No. 4:20-CV-1719, 2022 WL 838118, at *5 (M.D. Pa. Mar. 21, 2022).  Furthermore, when it is given that a claimant has a clear history

of depressive symptoms, an "ALJ fail[s] in her duty to develop the record when she d[oes] not order a consultative examination." Id. at *6.

In this case it is clear that Kenyon has a significant history of severe depression and anxiety. Therefore, once the ALJ resolved to reject every medical opinion, including the treating source consensus that Kenyon's anxiety was disabling, the proper exercise of discretion in terms of fulfilling the ALJ's duty to develop the record required some further neutral evaluation of the plaintiff's mental state. No such evaluation was undertaken in this case, and the failure to fill this evidentiary void constituted a failure to develop the record which now compels a remand.

In the final analysis, more is needed by way of explanation before an ALJ can reject all medical opinions in favor of her own subjective evaluation of the treatment records. Further, when an ALJ rejects a treating source medical consensus in a case that involves obvious and severe emotional impairments, it may be incumbent upon the ALJ to adequately develop the record in order to craft a valid an RFC. Since the ALJ's burden of articulation still is not met in the instant case, and the record may require further development given the ALJ's decision to reject all medical opinions, this matter must be remanded yet again for further consideration by the Commissioner. Yet, while we reach this result, we note that nothing in this

37

Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.  **<u>Conclusion</u>**

Accordingly, for the foregoing reasons, IT IS ORDERED that the plaintiff's request for a new administrative hearing is GRANTED, the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge


DATED: August 30, 2023